IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 06-cv-01245-PAB-CBS

MICHAEL WHITINGTON,

     Plaintiff,

v.

LT. SOKOL, JOHN DOE, C/O STRICKLER, C/O SPROWELS,
C/O PINEDA, C/O CALDWELL, and C/O JOHNSON,

     Defendants.

_____

**ORDER REGARDING STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
_____

     This matter is before the Court on the defendants' motion for summary judgment [Docket No. 142]. Plaintiff Michael Whitington, a prisoner who is proceeding *pro se*, filed this 42 U.S.C. § 1983 action against the defendants – all of whom are Colorado Department of Corrections personnel – for allegedly assaulting him during a transfer from one prison living unit to another. *See* Compl. [Docket. No. 3]. On October 16, 2008, Magistrate Judge Craig B. Shaffer filed a Recommendation of United States Magistrate Judge (the "Recommendation") [Docket No. 176] recommending that the defendants' motion for summary judgment be granted on the ground that Mr. Whitington's claims were filed outside of the applicable statute of limitations. Mr. Whitington timely filed his objections to the Recommendation. *See* Plaintiff's Objections to the Magistrate's Recommendations [Docket No. 180].

I.    **BACKGROUND**

A.  **Factual History**

In October 2001, Mr. Whitington was housed in a segregation unit at the Colorado Department of Corrections' Limon Correctional Facility.  Mot. for Sum. J. [Docket No. 142] ("Defs.' Br.") ¶ 2; Pl.'s Resp. to Mot. for Sum. J. [Docket No. 162] ("Pl.'s Resp.") ¶ 1.  Earlier that year, Mr. Whitington, who has a history of mental illness, stopped taking lithium that had been prescribed for him.  Pl.'s Resp., attach. 10-A.  In October 2001, Mr. Whitington believed that the prison staff was poisoning his food.  *Id.*

On October 25, 2001, Mr. Whitington was told that he would be moved from the segregation unit.  Whitington Affidavit dated July 14, 2008 ("July 14 Aff.") ¶ 9, attached to Pl.'s Resp.[1]  He had been ordered released from segregation on a number of prior occasions, but refused each time because he did not want to wear the prison-issued orange pants that would designate his status as a "restricted privileges" inmate.  July 14 Aff. ¶¶ 3-8; Defs.' Br. ¶ 4.  However, on October 25, correctional officers came to Mr. Whitington's cell, ordered him placed in full restraints, and escorted him to the prison's receiving area.  July 14 Aff. ¶¶ 9-10; Defs.' Br. ¶ 5.  According to Mr. Whitington, this area is a secluded part of the prison with no cameras and a controlled entrance.  July 14 Aff. ¶ 11.  There were no other inmates present in the receiving area.  Defs.' Br. ¶ 5. What happened in the receiving area is in serious dispute.

---

[1]  Mr. Whitington has submitted numerous affidavits in this case.  Individual affidavits will be referenced by the date each was executed.

### 1. Mr. Whitington's Version of Events

Mr. Whitington asserts that, once in the receiving area, he again refused to don the orange "restricted privileges" pants. July 14 Aff. ¶ 20. At this point, Lt. Sokol ordered him stripped and told Mr. Whitington that he "was going to wear the orange pants or he [Lt. Sokol] would take me [Mr. Whitington] to the unit naked." *Id.* ¶¶ 21-23. At that point, "[o]ut of fear," Mr. Whitington began backing away from the officers. *Id.* ¶ 24. The defendants – suddenly and without provocation – threw him to the ground and attacked him. *Id.* ¶ 25. He claims that he was hit, punched, and that one of the defendants, Correctional Officer Strickler, "began banging the side of [his] head on the floor saying 'you don't tell us no.'" *Id.* ¶ 26. He also claims that Correctional Officer Strickler repeatedly shocked him with a hand-held electrical device on the neck, buttocks, and testicles. *Id.* ¶¶ 27-28. He contends that this assault, and particularly the shocking, caused him severe pain in his lower back and testicles, made him paranoid of correctional officers, prompted auditory hallucinations, and "caused [him] to have panic and anxiety attacks for years after the incident." *Id.* ¶ 37.

### 2. Defendants' Version of Events

The defendants do not deny that an altercation occurred or that they used a shock device. However, they contend that they only applied force after Mr. Whitington acted in a threatening manner. For example, when ordered to put on the restricted privilege pants, the defendants claim that Mr. Whitington stated: "I'm not moving and I'll do whatever it takes." Defs.' Br. ¶ 10. Then, in the process of adjusting Mr. Whitington's restraints, Mr. Whitington pulled away from the defendants and

aggressively forced one of the correctional officers against the wall.  *Id.* ¶ 18.  It was only when Mr. Whitington remained resistant and refused to comply with the defendants' orders that an Ultron II electric immobilization device was applied.  *Id.* ¶¶ 19-29.  Correctional Officer Strickler states that he activated the Ultron II "for approximately eight seconds" on three separate occasions: twice on Mr. Whitington's "upper back/base of neck area" and once on his buttocks.  Strickler Aff. ¶¶ 13, 16, 19, 21, 22, attached to Defs.' Br. as Ex. B.  In other words, the defendants claim that they used reasonable force to subdue an unruly inmate.  Defs.' Br. at 18.

### 3.  Subsequent Events

Following this incident, Mr. Whitington was taken to the prison's medical facility for an evaluation of his injuries.  July 14 Aff. ¶ 36; Defs.' Br. ¶ 36.  Officials determined that he should be placed back in segregation, where he could be more closely monitored.  Defs.' Br. ¶ 39.  He was also interviewed by mental health staff.  *Id.* ¶ 40.  Although Mr. Whitington had been previously diagnosed as "psychotic," he claims that the alleged assault contributed to his paranoia, hallucinations, and acute psychosis.  July 14 Aff. ¶ 37; Whitington Affidavit dated Feb. 20, 2007 ("Feb. 20 Aff.") [Docket No. 53] ¶ 4.

Five days after the alleged assault, on October 30, 2001, Mr. Whitington was transferred to the Colorado Mental Health Institute at Pueblo ("CMHI") for treatment of psychotic behavior.  Defs.' Br. ¶ 43.  He remained at CMHI until May 9, 2002, when he was transferred to San Carlos Correctional Facility ("SCCF"), a facility for mentally ill inmates.  Whitington Affidavit dated July 9, 2008 ("July 9 Aff.") ¶¶ 1-2, attached to Pl.'s

Resp; *see also* Pl.s' Resp. attach. 14.  Mr. Whitington contends that he was repeatedly told by both CMHI and SCCF staff that he had not been shocked by the defendants, but rather that those memories were delusions due to his mental illness and would diminish with treatment.  July 9 Aff. ¶¶ 11-12.

Mr. Whitington returned to the general prison population in July 2004.  *Id.* ¶ 2.  In April 2005, Mr. Whitington was transferred back to the Limon facility and, upon interacting with several of the defendants, contends that he began to have "reoccuring [sic] thoughts of being assaulted."  *Id.* ¶ 13.  A few weeks later, on or about May 25, Mr. Whitington claims that he received documents from his attorney that confirmed to him that the alleged assault had, in fact, occurred.  *Id.*

### B.  Procedural History

Shortly after Mr. Whitington claims his memory was jogged as to the October 25 assault, he filed a prison grievance concerning the incident.  Feb. 20 Aff. ¶ 9.  The grievance process took several months and was not complete until February 2006.  *Id.* Four months later, in June 2006, Mr. Whitington filed his complaint.[2]  The defendants moved for summary judgment, arguing that, procedurally, Mr. Whitington's claims were barred by the statute of limitations and that, substantively, the alleged assault did not rise to the level of a constitutional violation.  Defs.' Br. at 10-23.  Mr. Whitington responded to the procedural argument by claiming that the statute of limitations should

---

[2]  The complaint asserts one claim, described as follows: "Defendants violated the plaintiffs [sic] 8th Amendment rights and state tort rights for assault and battery and/or caused it."  Compl. at 7 of 18.  As discussed herein, the focus of the summary judgment briefing, and the magistrate judge's report and recommendation, is the constitutional issue.  Thus, without deciding whether or not the state tort claim is viable or properly pled, I will focus solely on the Eighth Amendment claim.

be tolled during his time at CMHI and SCCF because he was mentally incompetent and, alternatively, that, because he was convinced by CMHI and SCCF staff that his memory of being shocked and assaulted was a delusion, he did not really "discover" his claim until May 2005.  Pl.'s Resp. at 4-10.  As for the substantive argument, Mr. Whitington contended that the events did, in fact, constitute cruel and unusual punishment.  *Id.* at 10-21.

The magistrate judge reviewed the evidence concerning Mr. Whitington's actions while at CMHI and SCCF and found that the evidence did not indicate that he was mentally incompetent during that time.  Recommendation at 5-7.  The magistrate judge further found that Mr. Whitington was aware of his claims on or around October 25, 2001, and thus rejected Mr. Whitington's argument that he only "discovered" his claims in May of 2005.  *Id.* at 7-8.  Given that he determined Mr. Whitington's claims should be dismissed as untimely, the magistrate judge declined to reach the substantive issue of whether Mr. Whitington had made out a constitutional violation.  *Id.* at 8.

Mr. Whitington filed objections to the Recommendation, specifically contesting both the "competence" and the "discovery" statute of limitations rulings.  Pl.'s Obj. to Magistrate's Ruling ("Pl.'s Obj.") [Docket No. 180].

II.   **ANALYSIS**

A.  **Standard of Review**

Where, as here, a party files timely objections to a magistrate judge's recommended disposition of a dispositive motion, a district court reviews the objected-to portion of the recommendation *de novo*.  Fed. R. Civ. P. 72(b).  The defendants are

entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if, considering the evidence, a reasonable jury could find in favor of the non-moving party. *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005). And a disputed fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).

The defendants, as the moving party, bear the initial burden of demonstrating that there is no genuine fact dispute. *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002). If they do so, the burden shifts to Mr. Whitington, the non-moving party, to "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574 (1986)) (emphasis in original). Mr. Whitington "may not rest upon mere allegations or denials of his pleadings," *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001), but rather must point to "specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Mitchell v. City of Moore*, 218 F.3d 1190, 1197-98 (10th Cir. 2000). This evidence "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Adams v. Am. Guarantee & Liability Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (internal quotations omitted).

When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in that party's favor. *Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009). Finally, because Mr. Whitington is proceeding *pro se*, I construe his pleadings liberally. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991).

## B.   Statute of Limitations

Mr. Whitington asserts his Eighth Amendment claim pursuant to the federal civil rights statute, 42 U.S.C. § 1983. Both federal and state law play a role in determining the timeliness of § 1983 claims. The length of the filing period is determined by reference to the relevant state's personal injury statute of limitations. *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008). In Colorado, this period is two years from the time the cause of action accrues. *Blake v. Dickason*, 997 F.2d 749, 750-51 (10th Cir. 1993). The accrual date – the time at which the limitations period begins to run – is controlled by federal law. *Mondragon*, 519 F.3d at 1082. "'Section 1983 claims accrue, for the purpose of the statute of limitations, when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir. 1994) (quoting *Johnson v. Johnson County Comm'n Bd.*, 925 F.2d 1299, 1301 (10th Cir.1991)). Once the claim accrues, state law again comes into play and governs any tolling of the limitations period. *Mondragon*, 519 F.3d at 1082.[3]

Colorado recognizes several tolling principles relevant here. First, by statute, Colorado tolls the limitations period for a "person under disability," which includes a

---

[3] "[F]ederal law might also allow additional equitable tolling in rare circumstances." *Mondragon*, 519 F.3d at 1082.

person who is mentally incompetent.  *Neiberger v. Hawkins*, 208 F.R.D. 301, 311 (D.

Colo. 2002); *see also* C.R.S. §§ 13-81-101, 13-81-103.  Second, courts may, under

certain circumstances, equitably toll the statute of limitations.  *See, e.g.*, *Dean Witter*

*Reynolds, Inc. v. Hartman*, 911 P.2d 1094, 1096 (Colo. 1996) ("[E]quity may require a

tolling of the statutory period where flexibility is required to accomplish the goals of

justice.").  Colorado courts have specifically noted two circumstances in which such

equitable tolling may apply: (1) where "the defendant has wrongfully impeded the

plaintiff's ability to bring the claim"; and (2) where "truly extraordinary circumstances

prevented the plaintiff from filing his or her claim despite diligent efforts."  *Id.* at 1099.

For a limitations period to be tolled because of equitable considerations, the party

asserting the statute of limitations as a defense usually must be the party who has

engaged in the conduct that makes equitable tolling necessary.  *Sharp Bros.*

*Contracting Co. & Sanders Co., Inc. v. Westvaco Corp.*, 878 P.2d 38, 44 (Colo. App.

1994).  "Once the statute of limitations is raised as an affirmative defense, the burden

shifts to the plaintiff to show that the statute has been tolled."  *Garrett v. Arrowhead*

*Improvement Ass'n*, 826 P.2d 850, 855 (Colo. 1992).

     As noted above, the Recommendation found that Mr. Whitington was not

mentally incompetent for the purpose of statutory tolling and also rejected Mr.

Whitington's argument that he did not "discover" his injury until 2005.  The latter is

essentially a finding grounded in the accrual doctrine, *i.e.*, as Mr. Whitington's claims

accrued in October 2001, the two-year limitations period began running at that point.

Mr. Whitington objects to this finding and reiterates his argument that, because CMHI

and SCCF staff told him that the October 25 assault was a delusion and not real, he should not be penalized for failing to file his complaint until after he saw the documents from his attorney in May 2005 that confirmed, in fact, that the incident had occurred. Pl.'s Obj. at 6-8.  A fair reading of this objection indicates that Mr. Whitington's argument is grounded in equitable tolling, not accrual.  *Id.* at 7 ("The Defendants causing the plaintiff not to discover the true facts of the claim until after his release from SCCF is [sic] unfair to dismiss the plaintiff [sic] claims for failure to file within two years of the incident.  The defendants cannot cause the delay of discovery or filing of the complaint and then claim that the complaint was untimely filed."); *see also Morrison v. Goff*, 91 P.3d 1050, 1053 (Colo. 2004) ("Tolling is a principle independent from accrual. The tolling of a statute of limitations will . . . suspend the running of the limitations period if the accrual date has passed.").  Moreover, a review of Mr. Whitington's response to the defendants' summary judgment motion indicates that equitable tolling is the argument he has been advancing throughout.  Pl.'s Resp. at 9 ("The SCCF staff should not be allowed not [sic] conceal the fact of constitutional violation, (not necessarily intentionally) and then claim that the plaintiff should have discovered the facts that supported his claims and move for dismissal based on an untimely filed complaint.").  I therefore consider whether, assuming the claim accrued when the assault occurred, Mr. Whitington has carried his burden to show that the limitations period should be equitably tolled.

As a threshold matter, the defendants contend that the statements by mental health officials that Mr. Whitington's memories of the assault were merely delusions cannot be considered on summary judgment because such statements would be

10

inadmissible hearsay at trial.  Defs.' Br. at 17-18; *see also Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (noting that hearsay testimony may not be considered to oppose a motion for summary judgment).  Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  "Statements offered for the effect on the listener . . . are generally not hearsay."  *Faulkner v. Super Valu Stores, Inc.*, 3 F.3d 1419, 1434 (10th Cir. 1993). Here, Mr. Whitington is not seeking to introduce the mental health officials' statements for the truth of the matter; indeed, he is explicitly asserting that those statements are not true.  Instead, the purpose of those statements is to demonstrate the effect on the listener, *i.e.*, to show why Mr. Whitington believed the assault had not occurred.  Thus, the statements are not hearsay.

There is at least some support in the CMHI records attached to Mr. Whitington's response brief for Mr. Whitington's claim that he was repeatedly told that the alleged assault and electric shock incident was a delusional ideation.[4]  A note in his CMHI file indicates that on October 30, 2001 – the day of his admission to CMHI – he told the staff that he had been "shocked" by guards at the Limon facility.  *See* Pl.'s Resp., attach. 7-B.  CMHI personnel appear to have regarded such claims of being shocked as delusional.  In a psychiatric assessment dated the next day, October 31, 2001, CMHI doctor John DeQuardo noted that "[i]n recent months Mr. Whitington has been voicing delusional beliefs that the DOC staff are poisoning him, have 'shocked' him and have 'gassed' him."  *See id.* attach. 7-A.  And in a note dated May 3, 2002 – just days before

---

[4]  In addition, none of the evidence attached to the defendants' briefs appears to contradict this claim.

his discharge from CMHI – staff recorded that Mr. Whitington "continues to voice paranoid ideation; he thinks he may be 'shocked and poisoned' when he returns." *See id.* attach. 8.  These documents suggest that CMHI personnel viewed Mr. Whitington's claim that he was assaulted and shocked as yet another paranoid delusion, like his claims that he was being poisoned (which even Mr. Whitington now admits were ideations, *see* July 9 Aff. ¶ 4).  As such, these materials offer some support for Mr. Whitington's claim that CMHI personnel told him that the alleged assault never happened.

Further, Mr. Whitington specifically asserts that the defendants' actions in assaulting him were a cause of his paranoid behavior that ultimately led to his transfer to CMHI and thereafter SCCF.  July 14 Aff. ¶ 37; Feb. 20 Aff.  ¶ 4.  Mr. Whitington was interviewed by prison mental health staff shortly after the October 25 incident.  Defs.' Br. ¶ 40.  Five days later, he was transferred to CMHI for treatment of psychotic behaviors.  *Id.* ¶ 43.  Reviewing the evidence in the light most favorable to Mr. Whitington, a rational jury could find from this sequence of events that the alleged assault and electric shocks were causally connected to Mr. Whitington's diminished mental state and his eventual admission to CMHI.  Although Mr. Whitington had not been taking his lithium medication and therefore may have had some mental instability before the October 25, 2001 incident, the defendants have not submitted any evidence to rebut Mr. Whitington's claim in his affidavits that the October 25, 2001 incident exacerbated his mental illness.

Under these circumstances, and at this stage of the proceedings, equitable tolling is appropriate.  Viewing the evidence in the light most favorable to Mr.

Whitington, "the defendant's wrongful conduct prevented the plaintiff from asserting his

. . . claims in a timely manner." *Dean Witter*, 911 P.2d at 1096.  A rational fact-finder

could conclude that the assault by the defendants exacerbated Mr. Whitington's

psychotic state, which led to his admission to CMHI, where he was convinced by mental

health professionals that the assault and shocking did not occur.  A rational fact-finder

could further find that it was not unreasonable for Mr. Whitington to believe the CMHI

staff, given his mental condition and the fact that these professionals were assigned to

help him.  Thus, accepting Mr. Whitington's evidence and his version of the facts, the

defendants' actions directly led to his belief that the incident was a hallucination – a

belief that dissipated only in May of 2005, when he allegedly received documents from

his attorney confirming that the incident had, in fact, occurred.  *Cf. Klamm Shell v. Berg*,

441 P.2d 10, 12 (Colo. 1968) (equitably tolling statute of limitations where an assault

caused the victim to become insane and mentally incompetent; "[A] defendant on the

basis of plain justice should not be allowed to rely on a statute of limitations, where his

intentional tort has caused mental incapacity arising after the cause of action accrued

but before the expiration of the period of limitation.").

For purposes of summary judgment, then, I cannot say as a matter of law that

Mr. Whitington's claims are barred by the statute of limitations.  Whether or not he was

"mentally competent" under Colorado's statutory tolling rules, the fact remains that

during the majority of the time between the October 25, 2001 incident and May 2005,

Mr. Whitington was confined to Department of Corrections mental health facilities and

was consistently diagnosed as delusional.  *See, e.g.*, Pl.'s Resp. attach. 5-B (CMHI

records stating that Mr. Whitington suffered "auditory hallucinations and paranoid and

13

bizarre delusions" at the time of his admission); 5-C (CMHI records stating that Mr.

Whitington "continued to manifest psychotic symptoms at the time of discharge"); 7-C

(psychiatric assessment of Dr. John R. DeQuardo indicating that Mr. Whitington

suffered hallucinations and delusions at the time of admission to CMHI).[5]  Assuming the

limitations period was equitably tolled during this period – from the time of Mr.

Whitington's admission to CMHI until May 2005 – his complaint, filed in June 2006, was

filed within the two-year statutory period and was therefore timely.  Because of this

ruling on equitable tolling, I need not reach the issue of whether the statute was also

tolled because Mr. Whitington was "mentally incompetent" during his time at CMHI and

SCCF.

### C.   Eighth Amendment

Resolving the case on statute of limitations grounds, the magistrate judge did not

address whether the defendants were entitled to summary judgment on Mr.

Whitington's substantive claim that they used excessive force in violation of his Eighth

Amendment rights.  That issue was fully briefed by the defendants in their motion for

summary judgment, *see* Defs.' Br. at 15-23, and Mr. Whitington filed a response, *see*

Pl.'s Resp. at 10-21.  In the interest of judicial economy, I will consider that issue here.

In their motion for summary judgment, the defendants asserted a claim of

qualified immunity.  "The doctrine of qualified immunity protects government officials

---

[5]  Of course, at trial, these facts may or may not be persuasive.  For example, as the magistrate judge noted in the Recommendation, there is tension between Mr. Whitington's claim that his mental illness should toll the statute of limitations and his current ability to recall specific details of the alleged use of excessive force on October 25, 2001.  Recommendation at 7.

'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, --- U.S. ---, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Qualified immunity requires inquiry into two distinct issues: (1) whether a plaintiff's claims make out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the alleged misconduct.  *Id.* at 815-16.  When a qualified immunity defense is asserted at the summary judgment stage, the burden shifts to the plaintiff to show that both prongs are met.  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009).  "If the plaintiff fails to satisfy either part of this two-part inquiry, the court must grant the defendant qualified immunity."  *Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1244 (10th Cir. 2008) (quotations and citation omitted).

Until recently, the qualified immunity inquiry was required to proceed in the sequence articulated above – first, a court was to consider whether a constitutional right was violated; only if a court found a violation did it proceed to determine whether that right was clearly established.  *See, e.g.*, *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  However, in *Pearson*, the Supreme Court modified the qualified immunity analysis and held that the two prongs could be considered in any order.  129 S. Ct. at 818.  Even so, "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient

disposition of each case." *Id.* at 821. I find the *Saucier* procedure helpful in this case and thus proceed to analyze the issues in the traditional order.

### 1. Constitutional Violation

The Eighth Amendment prohibits the use of excessive force against prisoners. *See, e.g.*, *Smith v. Cochran*, 339 F.3d 1205, 1212 (10th Cir. 2003). Judging whether force is excessive requires a court to bear in mind that in a prison environment, officials are often required to make quick decisions, in volatile situations, in an attempt to maintain order and discipline. In reviewing Eighth Amendment claims, "wide-ranging deference" is due to officials' execution of security and disciplinary policies and practices. *Hudson v. McMillian*, 503 U.S. 1, 6 (1992). While this deference precludes courts from "freely substitut[ing] their judgment for that of officials who have made a considered choice," it does not "insulate from review actions taken in bad faith and for no legitimate purpose." *Whitley v. Albers*, 475 U.S. 312, 322 (1986). Thus, an excessive force claim requires consideration of whether: (1) objectively, the allegedly wrongful conduct was sufficiently harmful to rise to the level of a constitutional violation; and (2) subjectively, the prison officials acted "with a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 6-7. "The objective component of an excessive force claim is contextual and responsive to contemporary standards of decency." *Id.* (internal quotations omitted). "'The subjective element of an excessive force claim turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" *Smith*, 339 F.3d at 1212 (quoting *Giron v. Corr. Corp. of Am.*, 191 F.3d 1281, 1289 (10th Cir. 1999)).

"Whether pain is wantonly and unnecessarily inflicted depends, at least in part, on whether force could have plausibly been thought to be necessary to maintain order in the institution and to maintain the safety of the prison personnel or inmates." *Hickey v. Reeder*, 12 F.3d 754, 758 (8th Cir. 1993) (citing *Whitley*, 475 U.S. at 320-21). It is with these standards in mind that I review Mr. Whitington's claim.

### a.  Objectively Harmful

The defendants argue that Mr. Whitington's lack of any severe injury indicates that they used only minimal force against him, and thus that their conduct was not unconstitutionally harmful. Defs.' Br. at 17-18. It is true that "[t]he Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327). Moreover, "[t]he extent of injury may be relevant in determining whether corrections officers unnecessarily and wantonly inflicted pain." *Northington v. Jackson,* 973 F.2d 1518, 1523 (10th Cir. 1992). However, the absence of injury "does not end the inquiry." *Id.* If it did, "'a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis.'" *United States v. LaVallee,* 439 F.3d 670, 688 (10th Cir. 2006) (quoting *Brooks v. Kyler*, 204 F.3d 102, 108 (3d Cir. 2000)).

Here, the defendants assert that the prison's medical examination of Mr. Whitington shortly after the October 25 incident showed that he had only (1) multiple

red marks on his chest, back, and shoulders; (2) superficial abrasions on his wrist; (3) superficial abrasions to his right knee and ankle; (4) superficial abrasions to his left hand; and (5) red marks on the right side of his ankle.  Defs.' Br. at 17-18; *see also* Defs.' Br., Ex. E, Attachment 7.  But even assuming these injuries are "minor," that fact in and of itself does not show that the force used was minimal.  Moreover, Mr. Whitington claims that the medical examination relied on by the defendants was cursory and that the nurse examining him never inspected his stomach or groin area, suggesting that the records of his injuries may be incomplete.  July 14 Aff. ¶ 37. Mr. Whitington further asserts that during the alleged assault, the defendants "threw [him] to the floor," "punch[ed] [him] in [his] back," "bang[ed] the side of [his] head on the floor," and shocked him repeatedly with a handheld electronic device.  *Id.* ¶¶ 26-28.  The defendants admit that Correctional Officer Strickler shocked Mr. Whitington with the Ultron II three times.  Strickler Aff. ¶¶ 13, 16, 19, 21, 22, attached to Defs.' Br. as Ex. B. Mr. Whitington claims that the incident caused him severe pain in his back and testicles and also caused psychological injuries such as paranoia and panic attacks.  July 14 Aff. ¶¶ 26-28.  Courts have recognized that similar injuries are sufficient to support an Eighth Amendment claim.  *See, e.g.*, *DeSpain v. Uphoff*, 264 F.3d 965, 978-79 (10th Cir. 2001) (allegations that prisoner suffered burning eyes and lung congestion as a result of guard's pepper spraying of prisoner, and ongoing anxiety thereafter, sufficient for excessive force claim); *Northington*, 973 F.2d at 1524 ("[P]sychological injury may constitute pain under the Eighth Amendment excessive force standard.").  As such, at this stage it is at least disputed whether the defendants' actions were harmful enough to rise to the level of a constitutional violation.

18

### b.   Subjectively Unnecessary

The defendants argue that they acted in a "good-faith effort to maintain or restore discipline," as opposed to "maliciously and sadistically to cause harm," *Hudson*, 503 U.S. at 6-7, because the force applied was justifiable and necessitated by Mr. Whitington's misconduct.  Specifically, the defendants claim that once Mr. Whitington was in the receiving area with his restraints removed, he pulled away from the officers, "shoved" one of the officers against the wall, and continued to refuse the officers' attempts to re-apply his restraints.  Defs.' Br. at 19-20.  It was only because of this assaultive and disobedient behavior that the defendants acted as they did.  *Id.*  Under these circumstances, the defendants claim, their use of force was justified to restore control and ensure compliance.

The problem with this argument is that the defendants' version of the facts is vigorously contested by Mr. Whitington.  Mr. Whitington claims that the defendants took him to a secluded part of the prison where there were no cameras or other prisoners. July 14 Aff. ¶¶ 11-13.  He claims that, once his restraints were removed, he again refused to wear the orange "restricted privilege" pants and "[o]ut of fear . . . began backing away from the officers that were surrounding [him]."  July 14 Aff. ¶¶ 20-24.  It was at that point that the defendants threw him to the ground, beat, and shocked him. *Id.* ¶¶ 25-28.  He claims he did not threaten or push any of the defendants and that he was not resistant.  *Id.* ¶¶ 33-34.  Summary judgment is not the place to resolve this dispute.  *Hall,* 935 F.2d at 1111 ("Material factual disputes cannot be resolved at summary judgment based on conflicting affidavits.").  Instead, the question is whether,

19

viewing the facts in Mr. Whitington's favor, his version of events could make out an Eighth Amendment claim.

The Supreme Court has outlined several factors relevant to determining whether force was inflicted wantonly and unnecessarily, including "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321); *see also Mitchell v. Maynard*, 80 F.3d 1433, 1440 (10th Cir. 1996) ("In making [the excessive force] determination, it is necessary for us to balance the need for application of force with the amount of force used.").  Moreover, "[w]here no legitimate penological purpose can be inferred from a prison employee's alleged conduct, the conduct itself constitutes sufficient evidence that the force was used maliciously and sadistically for the very purpose of causing harm."  *DeSpain*, 264 F.3d at 978 (internal quotations, citations, and alterations omitted).

The facts in Mr. Whitington's affidavit indicate that there was little need for the application of force, and the force applied was severe.  At most, under Mr. Whitington's version of the events, he was disobeying a lawful order to put on the proper clothing. He was not violent and did not provoke the incident.  Under these facts, there was no legitimate penological purpose for the defendant's unprovoked actions.  *Cf. Purkey v. Green*, No. 00-3218, 28 F. App'x 736, 744 (10th Cir. Aug. 17, 2001) (prisoner's allegations that guard's attack on him was unprovoked and unnecessary gave rise to inference that the action was maliciously and sadistically intended to cause harm).  In

short, Mr. Whitington's story, if true, suggests that the defendants acted not to maintain or restore order, but rather to "maliciously and sadistically" cause him harm.

This conclusion is supported by *Green v. Branson*, 108 F.3d 1296 (10th Cir. 1997) and *Hickey v. Reeder*, 12 F.3d 754 (8th Cir. 1993). Like this case, *Green* involved an excessive force claim against prison guards stemming from a fight with an inmate. *Id.* at 1298. And, as here, the facts of the altercation were in dispute. The inmate claimed that he was simply seeking legal information from another inmate when one of the correctional officers became impatient and attacked him; the correctional officers claimed that the inmate precipitated the attack by hitting one of them in the face with handcuffs. *Id.* at 1298-99. The Tenth Circuit reversed the district court's grant of summary judgment in favor of the officers, finding that the inmate's evidence of an unprovoked attack, if believed by the trier of fact, would show that force was applied wantonly for the purpose of causing harm. *Id.* at 1300-02. Of particular importance, the court noted that "[w]hether or not [the inmate] provoked the incident is a material fact since that is the basis which the guards relied on in using force to subdue [him]," and that it was up to the trier of fact to resolve the "clear conflicts in the evidence." *Id.* at 1301, 1302.

Similarly, in *Hickey*, a prison inmate was shot with a stun gun by prison officials when he refused an order to sweep his cell. *Id.* at 756. The court of appeals found that even though the order was a legitimate one, the use of the stun gun to enforce compliance rose to the level of wanton and unnecessary infliction of pain in violation of the Eighth Amendment:

There is no question that prison officials may compel compliance with legitimate prison regulations. A requirement that inmates sweep their cells is clearly a legitimate regulation. Nor do we dispute that circumstances may arise where prison officials are justified in using summary physical force. These three facts, however, simply do not translate into a mandate to use summary physical force to compel compliance with all legitimate rules.

Our review of the law shows that summary applications of force are constitutionally permissible when prison security and order, or the safety of other inmates or officers, has been placed in jeopardy. [Citing cases]

. . . .

The common thread running through all of the cases is a concern for the safety of the institution and for those within its walls. We do not attempt to limit good faith applications of force where it is reasonably thought to be necessary to maintain the order and security of a penal institution, but summary force has yet to be ratified as the *de jure* method of discipline where security concerns are not immediately implicated. . . .  We have not found, and hope never to find, a case upholding the use of this type of force on a nonviolent inmate to enforce a housekeeping order.

*Id.* at 758-59.

Here, as in *Green* and *Hickey*, the inmate's versions of the facts set forth an exaggerated response to a non-violent inmate.  At this stage of the proceeding, then, Mr. Whitington has carried his burden to demonstrate a genuine dispute of material fact on the question of whether the defendants violated his constitutional rights.  *See also Lowe v. Sockey*, No. 00-7109, 36 F. App'x 353, 357-58 (10th Cir. April 2, 2002) (finding a material fact dispute over whether correctional officers used excessive force where *pro se* prisoner stated that officers threatened him, started a struggle with him, "struck" and "beat" him while he was in restraints, and hit him while he was being held by another officer).

22

## 2. *Clearly Established*

Having concluded that Mr. Whitington has adduced evidence sufficient to show that the defendants used excessive force, I next consider whether the defendants' actions violated "clearly established" law. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). But the qualified immunity analysis is not merely "a scavenger hunt for prior cases with precisely the same facts." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). Rather, the "more relevant inquiry" is "whether the law put officials on fair notice" that their actions were unconstitutional. *Id.* As such, "[t]he degree of specificity required from prior case law depends in part on the character of the challenged conduct. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to establish the violation." *Id.; see also Anderson v. Blake*, 469 F.3d 910, 914 (10th Cir. 2006) ("[A] general constitutional rule that has already been established can apply with obvious clarity to the specific conduct in question, even though the very action in question has not been previously held unlawful.") (citations and alterations omitted).

The defendants' only argument that the law was not "clearly established" is that courts have found that the use of a taser or stun gun is not *per se* unconstitutional when used to gain compliance by prison inmates.  Defs.' Br. at 22-23.  However, the issue in this case is not so much about the type of weapon used, but rather the level of force applied and the justification therefor.  Whether or not a stun gun might be constitutional in certain situations does not resolve the question of whether the defendants' behavior here violated clearly established Eighth Amendment law.

Moreover, the cases cited by the defendants involve aggressive, hostile, or unruly individuals.  *See Hunter v. Young*, No. 06-3371, 238 F. App'x 336, 339 (10th Cir. June 12, 2007) (not excessive force to use stun gun against prisoner in lockdown who had recently been involved in altercation with other guards); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (use of taser gun to effectuate arrest not excessive force in violation of Fourth Amendment when arrestee "hostile, belligerent, and uncooperative"); *Jasper v. Thalacker*, 999 F.2d 353, 354 (8th Cir. 1993) (not excessive force to use stun gun to subdue inmate who verbally threatened and "clenched his fists and lunged toward" correctional officer); *Caldwell v. Moore*, 968 F.2d 595, 599-602 (6th Cir. 1992) (not excessive force to use stun gun to subdue inmate who had "demonstrated a propensity for violence" and who was shouting and kicking cell door for several hours); *Michenfelder v. Sumner*, 860 F.2d 328, 335-36 (9th Cir. 1988) (policy permitting use of tasers "for controlling potentially dangerous situations" not unconstitutional).  These cases do not suggest that stun guns, in combination with physical beating, may be used against a nonviolent prisoner who has refused a lawful

24

order to don appropriate clothing, which are the facts that I must assume on summary judgment.

Indeed, it is clearly established that such behavior violates the Eighth Amendment.  The constitution prohibits using excessive force maliciously with the intent to cause harm, *Hudson*, 503 U.S. at 6, and using an amount of force that is not commensurate with the need for force, *Mitchell*, 80 F.3d at 1440.  Accepting Mr. Whitington's evidence, the defendants violently assaulted and shocked an inmate who was neither acting aggressively nor posing a danger to himself or others.  This force is plainly excessive of any legitimate penological need.  In light of the "obviously egregious" nature of this attack, *Pierce*, 359 F.3d at 1298, a reasonable officer would be aware that the defendants' actions were unlawful.  The defendants are not entitled to qualified immunity at this stage of the proceedings.

## III.  CONCLUSION

This case presents the sort of factual dispute unfit for summary judgment. Accepting the defendants' version of the story, they used appropriate and properly authorized force to subdue an aggressive inmate.  Under Mr. Whitington's version, however, the defendants violently attacked him over a clothing dispute in a secluded area of the prison, causing physical and psychological pain.  Indeed, the attack was so serious that it helped lead to his admission to a mental health institution, where he was made to believe, by his treating doctors, that the attack never happened.  Resolution of the issues in this case requires determining which of these conflicting accounts to

believe.  That is a decision for the factfinder, and thus summary judgment is inappropriate.

Accordingly, it is

**ORDERED** as follows:

1.      The Recommendation of United States Magistrate Judge [Docket No. 176] is OVERRULED.

2.      The State Defendants' Motion for Summary Judgment [Docket No. 142] is DENIED for the reasons stated herein.

3.      Mr. Whitington's request for counsel and an expert witness is DENIED. Mr. Whitington makes this request in his Objections to the Magistrate's Recommendations [Docket No. 180].  Specifically, he asserts that he needs "counsel and a medical expert to support his claim of [mental] incompetence for the purpose of tolling the statute for disabled persons." Even assuming this request is properly before me, as I do not reach the issue of whether the statute of limitation should be tolled on the grounds of Mr. Whitington's asserted mental incompetence, this request for counsel and an expert witness is unnecessary and therefore MOOT.

DATED this 18th day of August, 2009.

                                        BY THE COURT:


                                        s/Philip A. Brimmer_____
                                        PHILIP A. BRIMMER
                                        United States District Judge